Robert A. Simon
Texas Bar No. 18390000
**WHITAKER CHALK SWINDLE
& SCHWARTZ, PLLC**
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0543
Facsimile: (817) 878-0501
rsimon@whitakerchalk.com
**Attorneys for Cord Davis Johnson
and Sunny Lea Johnson, Debtors**

## IN THE UNITED STATES BANKRUTPCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **CORD DAVIS JOHNSON and** | § | **CASE NO:  19-42063-ELM -7** |
| **SUNNY LEA JOHNSON,** | § | |
| | § | |
| **DEBTORS.** | § | |

**DEBTORS' REPY TO U.S. TRUSTEE'S OBJECTION TO THEIR MOTION TO
CONVERT THEIR CHAPTER 7 CASE TO A CASE UNDER CHAPTER 11,
AND FOR AUTHORITY TO ELECT TREATMENT UNDER
SUBCHAPTER 5, AS A SMALL BUSINESS CASE**
(Pertains to Docket Nos. 57 and 61)

**TO THE HONORABLE EDWARD L. MORRIS,
UNITED STATES BANKRUPTCY JUDGE**:

Cord Davis Johnson and Sunny Lea Johnson (the "Debtors") file this Reply (the "Reply")

to the United States Trustees' Objection ("Objection") to their Motion to Convert their Chapter 7

Case to a Case Under Chapter 11, and for Authority to Elect Treatment Under Chapter 11,

Subchapter 5, as a Small Business Case (the "Motion").  The Objection has no merit, on the facts

or the law, and should be overruled.  In support, the Debtors respectfully represent:

## I.

## SUMMARY OF REPLY

The Debtors have not acted in bad faith either pre-petition or post-petition.  The Debtors sought bankruptcy protection on May 22, 2019 for the same reason that many others seek that relief, to escape the crushing burden of debt they could never repay in full and to stop the bleeding from unsustainable litigation expenses.  There is nothing improper about that motivation.  The Bankruptcy Code exists for precisely that purpose.  Most of the Debtors' obligations were incurred due to reverses in the oil and gas business.  Those same misfortunes sparked the litigation from disappointed investors, lawsuits that the Debtors could not afford to defend and simultaneously pay for their own maintenance and support.  The Debtors needed bankruptcy relief.  However, the amount of the Debtors' liabilities made them ineligible for relief under Chapter 13.

That left only two (2) options, Chapter 7 or Chapter 11.  The Debtors were legally eligible for relief under either Chapter, but in May 2019, Chapter 11 was not a practical option.  The Debtors needed Sunny Johnson's income as a nurse to meet basic expenses, and Cord Johnson was then earning very little money.  Furthermore, Chapter 11 cases, even for individuals, were prohibitively expensive.  The high burden of administrative expenses under Chapter 11 as it existed before the effective date of the Small Business Reorganization Act (the "SBRA") and the Debtors' modest income made that option impractical as well.[1]  The case would have failed and ended up in Chapter 7 anyway.  Thus, Chapter 7 was the only viable option.

However, the only constant in life is change.[2]  Much has happened since May 22, 2019 (the "Petition Date").  First, the Debtors' income has improved as the business fortunes of El Reno

---

[1] The concept of "small business case" existed before the enactment of the SBRA.  Unfortunately, the small business provisions that pre-dated the SBRA were scarcely less expensive and in some ways more cumbersome than the provisions applicable to "regular" Chapter 11 cases.  The SBRA is a vast improvement in the law.
[2] Heraclites, Greek philosopher, Sixth Century BCE.

Service have brightened and Cord Johnson's mother has increased his salary accordingly. The Debtors now have disposable income that could be devoted to a small business plan of reorganization. Second, on August 23, 2019, Congress enacted the SBRA, to become effective on February 19, 2020. The SRBA streamlines procedures, eliminates burdensome U.S. Trustee's fees, allows for the payment of administrative claims over the course of the plan, and eliminates the requirements of absolute priority and acceptance by an impaired class of claims. Thus, the new Chapter 11, Subchapter 5 makes reorganization a viable option for many small business debtors, when previously it was not. The Debtors are now eligible for that relief and are entitled to pursue it. If they are successful, their creditors will receive payments equal to five (5) years of the Debtors' disposable income. In Chapter 7, they would receive nothing.

The Debtors have a presumptive right to convert their Chapter 7 case to Chapter 11. 11 U.S.C. § 706. Under the plain language of the statute, that right is absolute. The Supreme Court has recognized (more accurately created) a very narrow exception to that absolute right, for circumstances in which the debtors have acted in such egregious bad faith that dismissal of their bankruptcy case is warranted. *See Marrama v. Citizens Bank,* 549 U.S. 365, 127 S.Ct. 1105 (2006). Those facts do not apply here. The Debtors have not acted in bad faith. It is surprising and disappointing that the U.S. Trustee has worked so diligently to portray economically immaterial and quite innocent errors by laymen in completing their Schedules and Statement of Financial Affairs (the "SOFA") as somehow nefarious.

Finally, the U.S. Trustee argues that the Debtors cannot be small business debtors because: (1) Cord Johnson's debts were incurred in oil and gas businesses that are no longer active, and not in El Reno Energy, LLC d/b/a El Reno Service ("El Reno"), the business Mr. Johnson currently manages, and (2) the Debtors do not own or ultimately control El Reno. That argument rest on

two separate but related misconstructions of the statute, now 11 U.S.C. § 1182(1)(A). The U.S. Trustee argues that the debtor must be "engaged in commercial or business activities" at the petition date, and cannot use the small business bankruptcy provisions to reorganize debts recently incurred in a failed business. However, the statute does not support that construction. The words "as of the date of the petition" modify the amount of debt that the small business debtor can owe. They do not modify the words "engaged in business or commercial activities." The U.S. Trustee asks the Court to insert those words into the statutory text in a place where Congress chose to leave them out. That is not proper statutory construction.

Second, the U.S. Trustee argues that the small business debtor must own the business or commercial activity in which he/she is engaged. That is also a faulty construction that requires the Court to insert new words into the statutory text that Congress left out. Cord Johnson is "engaged in business or commercial activities. He manages El Reno, which is a substantial and growing business. He does not own it. It is subject to his mother's control as owner. However, the management of El Reno is a full time endeavor that fully occupies Mr. Johnson's time and efforts. So as long as he manages the business well, his mother is unlikely to fire him. The plain language does not require that the debtor own the business in which he is engaged. The Court should apply the statute as written and not pretend to see invisible words not present in the text.

## II.

## FACTS

### A.    Background of the Case

1.    When the Debtors filed their Chapter 7 case, the provisions of the new Subchapter 5 did not yet exist. The Debtors owed too much money to be eligible for Chapter 13. They could not afford Chapter 11 as it then existed. The Debtors had no viable option except Chapter 7.

Regrettably the case was handled as though it were an ordinary, consumer Chapter 7 case, which it was not. Cord Johnson was involved in bitter litigation with Armadillo Exploration and its principal, John Hill, who are angry and disappointed investors in Cord Johnson's prior oil and gas ventures. The Debtors' prior counsel sent them a blank set of Schedules and a blank SOFA, which they did their best to fill out. The Debtors spent approximately an hour with their counsel reviewing the Schedules and SOFA before signing them.[3] Given the great length of the Debtors' 110 pages of Schedules and SOFA and the complexity of Cord Johnson's business dealings that was not a sufficient review. The Debtors are neither lawyers nor accountants. They did not have a staff of clerks and accountants to help out. The Debtors were not advised that their most hostile creditors (and the U.S. Trustee) would use their Schedules and SOFA not as guides to identify potential assets for distribution to creditors but instead as litigation weapons to find innocent and immaterial errors and use them to portray the Debtors as liars. They should have been so advised.

2.      The Debtors did the best they could with the Schedules and SOFA, given their knowledge and experience, and the information available at the time.[4] The Debtors are not bankruptcy lawyers, and the U.S. Trustee's efforts to hold them to that standard is not appropriate. Debtors are required to complete their Schedules and SOFA in good faith, but they are not required to be perfect. Most sets of schedules and SOFAs for individual debtors contain minor errors and omissions. Schedules and SOFAs are routinely amended to correct such errors and omissions. If perfection were the standard, very few debtors would receive a discharge. Furthermore, the

---

[3] The Debtors were charged a law fee of $3,500, a typical fee for a consumer Chapter 7 case. The Debtors' counsel gave their case the attention of a typical consumer Chapter 7 case. Unfortunately, the Debtors were not typical Chapter 7 debtors. To prepare the Debtors properly for a Chapter 7, given the complex history of Cord Johnson's pre-petition business dealing, and the ongoing litigation with former investors, would have required many hours of careful investigation and review by counsel and far more than $3,500 in fees.
[4] For example, the accounting books for Jacie Oil Co., LLC, JCS Oil & Gas, LLC, and R1CDF, LLC was not completed on the Petition and would not be completed until 2020.

Debtors' prior counsel never advised them to amend their Schedules and SOFA to correct errors and omissions when they came to light.

3.      Properly advised by a business bankruptcy lawyer,[5] the Debtors and their counsel would have devoted many more hours to the Schedules and SOFA to improve their technical accuracy and limit the Debtors' vulnerability to tactical nitpicking. After engaging new counsel, the Debtors have done so. As amended, the Schedules and SOFA are more complete and more accurate from a technical perspective, but the corrections do not disclose a single dollar's worth of omitted assets or recoverable transfers available for distribution to creditors. The Debtors did not hide anything. They did not intentionally omit anything of value. There is no bad faith.

4.      Chapter 11, Subchapter 5 became effective on February 19, 2020, and it is appropriate to this type of case. The Debtors have business debts. They owe too much money for the Chapter 13. Chapter 11, Subchapter 5 provides a framework for the Debtors to pay their creditors what they can afford to pay for five (5) years and obtain a discharge if they complete the plan. If Subchapter 5 had existed on the Petition Date, the Debtors should have been advised to seek relief under that provision. That was impossible at the time. It is possible now, and it is the best course of action for the Debtors and their creditors.

**B.      Yes, Much Has Changed in the 13 Months Since the Petition Date**

5.      The U.S. Trustee complains that the Debtors have given inconsistent testimony about the financial condition of El Reno and Cord Johnson's current earnings. That complaint is misplaced. Cord Johnson's testimony was accurate when given, but the facts changed over time. The U.S Trustee implicitly acknowledges that in paragraph 44 of the Objection:

---

[5] The Debtor's prior counsel is a capable and diligent consumer bankruptcy lawyer. This case simply is not a consumer bankruptcy case. It required the knowledge and experience of a business bankruptcy lawyer, with experience in discharge and dischargeability litigation.

Admittedly, the Debtors could argue that much has changed post-petition between the filing of the bankruptcy on May 22, 2019 and the Conversion Motion, and that Mr. Johnson's mother had both: 1) promoted him to an officer and 2) increased his salary to $6,000 per month since filing.

Yes, the Debtors could argue that, **because it is true.**

### *Ownership and Control of El Reno*

6.      The U.S Trustee struggles to understand a relatively simple set of facts.  The struggles are so great that it appears the U.S. Trustee is trying not to understand the facts, but instead to obfuscate them for litigation advantage.

7.      The facts are as follows.  Lloyd Johnson, Cord Johnson's late father, formed El Reno in June 2017.  Lloyd Johnson owned 100% of the equity interest.  El Reno's business included oil and gas operations and trucking, particularly the trucking of road building materials. In 2017, Cord Johnson's own oil and gas ventures failed, due to low energy prices and disappointing results in leasing, drilling, and completing wells.  Cord Johnson started working for his father's business, El Reno, though he was not initially compensated.  Cord worked for El Reno because his father needed the help, and Cord was familiar with aspects of the business.  Cord Johnson acted as drilling manager for wells being drilled or worked over.

8.      In 2018, El Reno put Cord Johnson on the payroll at modest compensation.  During the year, Lloyd Johnson developed pulmonary fibrosis, and his health began to fail.  Cord gradually did more of the work as his father's health declined.  On November 27, 2018, Lloyd Johnson died from his illness.  Cord became the fulltime manager of the business, though without a title or formal office.  The equity interest in El Reno passed to Lloyd Johnson's wife, Cord Johnson's mother, Haven Johnson, through Lloyd Johnson's Will.  She owns 100% of the membership interest in El Reno.  The Debtors have no equity interest in El Reno.  Haven Johnson is competent and has full authority to manage and control the business.  However, at his mother's request, Cord

Johnson manages the business affairs of El Reno on a day to day basis, subject to her ultimate control. After the Petition Date, and before the Section 341(a) meeting, Haven Johnson gave Cord the title of President to reflect his increased responsibilities.

9.      In 2018, Cord Johnson was paid about $2,500 per month for helping to manage El Reno. In 2019, after Lloyd Johnson's death, Haven Johnson increased Cord Johnson's compensation to approximately $4,000 per month. More recently, in 2020, Haven Johnson increased Cord Johnson's monthly salary to $6,000, which is paid by W-2.[6] That salary is more commensurate with the title of President and the responsibility of running a substantial commercial enterprise. Haven Johnson controls El Reno and could fire Cord Johnson if she wanted to. However, as long as Cord Johnson manages the business well, she is unlikely to do so.

*The Changing Business Fortunes of El Reno*

10.      El Reno provides trucking services for road building materials, such as gravel and other concrete aggregate. The business of building roads and pouring concrete slows down in the wintertime.[7] As a result, trucking services for that industry is also seasonal, with a substantial slowdown in the winter. In January 2020, business was slow. Many of El Reno's trucks were parked, and the business was not making money at the time. El Reno owed $100,000 in accrued and unpaid Section 941 taxes. Cord Johnson testified truthfully to those facts on January 31, 2020 in his continued Rule 2004 examination.

11.      However, seasons and economic conditions change with time. The market for road building materials improved in the spring with the return of warmer, drier weather. El Reno trucks are now busy hauling concrete aggregate for road building. El Reno still owes about $100,000 in

---

[6] In the past, Haven Johnson has permitted El Reno to make modest gifts to her son, Cord Johnson, such as a high end bicycle and an occasional family vacation. She is under no obligation to do so.

[7] Concrete is not poured in the rain. Nor can it be poured if the temperature is too cold.

accrued Section 941 taxes, but it is now paying its Section 941 taxes as they accrue. El Reno is in

negotiations with the IRS for a payout of the back taxes. When the Motion to Convert was filed,

El Reno had very little active oil and gas business. Since then, El Reno and several joint interest

partners have agreed to drill a new well in West Texas.[8] El Reno is now making money on an

operating basis and accumulating some cash. El Reno expects to be profitable for the year and is

optimistic about the future. As El Reno's cash flow has improved, it can afford to pay its President

a salary appropriate to his responsibilities and the size of enterprise. Cord Johnson now earns

enough from managing El Reno to fund a meaningful distribution to creditors through a

Subchapter 5 small business reorganization.[9]

## C.   <u>False Allegations by the United States Trustee</u>

12.   In paragraph 38 of the Objection, the U.S. Trustee falsely accuses Cord Johnson of

running a "Ponzi-like scheme."[10] The word "Ponzi scheme" has a fixed meaning in law. A Ponzi

scheme is a "fraudulent investment scheme in which money contributed by later investors

generates artificially high dividends or returns for the original investors, whose example attracts

even larger investments." *Am. Cancer Society v. Cook*, 675 F.3d 524, 527-28 (5th Cir. 2012)

(citing *Janvey v. Alguire,* 647 F.3d 585, 597 (5th Cir. 2011) (quoting BLACK'S LAW

DICTIONARY 1198 (8th ed. 2004)). Cord Johnson's prior oil and gas ventures solicited

investor money for oil and gas leasing, drilling, and completion. The money raised from

investors was used for those purposes. The money was not used to pay artificially high

dividends or returns for the original investors, which is the defining characteristic of a Ponzi

---

[8] At the Petition Date, El Reno was an operator of record with Texas Railroad Commission. When the Motion was filed, El Reno had one producing well and several active permits, but it was not actively drilling. The collapse in oil prices in March and April 2020 and resulting decline in drilling activity reduced drilling and completion costs so much that certain drilling projects now make economic sense. El Reno is now back in the oil and gas business.
[9] The Debtors would use Sunny Johnson's nursing income to pay for their maintenance and support.
[10] The U.S. Trustee appears to make this false allegation simply to smear the Debtors' character. That is a tactic for private litigants, not appropriate for the Department of Justice.

scheme.  There is no evidence that occurred.  Mr. Johnson also took compensation, but owners

of businesses regularly take compensation for their work.  There is nothing improper about that.

The U.S. Trustee's allegation lacks any foundation in fact or law and should be withdrawn.

### III.

### ARGUMENT

#### A.     The Debtors Have a Right to Convert to Chapter 11

13.     Whether the Debtors will succeed in Chapter 11 remains to be seen, but they have

the right to try.  Section 706(a) states that "a debtor may convert a case under this chapter to a case

under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section

1112, 1208, or 1307 of this title."  This case has not been previously converted from another

chapter.  The only other statutory condition is that "a case may not be converted to a case under

another chapter of this title unless the debtor may be a debtor under such chapter.  11 U.S.C. §

706(d).  That makes sense.  An individual who owes more than the debt limit cannot convert to a

case under Chapter 13.  A debtor who has neither farmed nor fished commercially cannot convert

to a case under Chapter 12.  However, Section 706 includes no other limitation.

14.     Notwithstanding the clarity of the statutory language, the Supreme Court created

(from whole cloth) a very narrow exception in *Marrama v. Citizens Bank,* 549 U.S. 365 (2007).

In that case, the debtor filed a Chapter 7 and failed to disclose "his principal asset, a house in

Maine." *Marrama*, 549 U.S. at 368, 127 S.Ct. at 1108.  The debtor had transferred the house seven

(7) months before the petition date for no consideration.  The debtor "admitted that the purpose of

the transfer was to protect the property from his creditors." *Id.*  The Chapter 7 trustee advised Mr.

Marrama that he intended to recover the house for the benefit of the estate.  At that point, the debtor

file a Verified Notice of Conversion to Chapter 13, which was treated as a motion to convert.  Had

the debtor successfully converted the case to Chapter 13, the Chapter 7 trustee would have been dismissed. The debtor would have regained control of the house, subject to the requirements of 11 U.S.C. § 1325(a)(4). The Chapter 7 trustee and Citizens Bank objected and argued that the motion to convert was filed in bad faith and would constitute an abuse of process. The Bankruptcy Court denied the motion. On appeal, the First Circuit affirmed the denial, holding that the right to convert is absolute in the "***absence of extreme circumstances***." *Marrama*, 549 U.S. at 370, 127 S.Ct at 1109. Certainly, the circumstances were extreme.

15.     However, the statutory language of Section 706 contains no exception for "extreme circumstances," or any other justification for not reading the statute and applying it as written. Faced with that conundrum, the Supreme Court affirmed, in a divided opinion. The majority looked to Section 706(d), which conditions the right to conversion on the debtor's eligibility to be a debtor under the chapter to which the debtor seeks conversion. The majority reasoned that a debtor might not be eligible for relief under Chapter 13 due to pre-petition bad faith conduct of such magnitude that it would justify dismissal of the case:

> In practice effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of pre-petition bad faith conduct, including fraudulent acts committed in an earlier Chapter 7 proceeding, is tantamount to a ruling that an individual does not qualify as a debtor under Chapter 13.

*Marrama*, 549 U.S. at 373, 127 S.Ct at 1111. The dissent cogently argued that the majority's construction of the statute contradicted the plain meaning of the statutory language.[11] *Marrama*, 549 U.S. at 379-81, 127 S.Ct at 1114-15.

16.     As a matter of sound statutory construction, i.e. reading the words of the statute and applying their plain meaning, the dissent was correct. The Bankruptcy Code contains no "bad

---

[11] The Bankruptcy Code is a statute and should be construed in accordance with the plain meaning of the statutory language. *United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 109 S.Ct. 1026, 1030 (1989).*

faith" exception to the debtor's eligibility for Chapter 13.    Good faith is a requirement for

confirmation of a Chapter 13 plan.  11 U.S.C. § 1325(a)(7).    Bad faith may be cause for dismissal

or conversion.  11 U.S.C. § 1307(c).  However, good faith is **not** a requirement for Chapter 13

eligibility. *See* 11 U.S.C. § 109(e).  There were plenty of statutory remedies available to Citizens

Bank or the Chapter 7 trustee without disregarding plain statutory language to reach a desired

result.  As the dissent points out, the debtor's case could have been converted back to Chapter 7

for cause.  The debtor's discharge could have (would have) been denied based upon his admission

that he transferred the house for the purpose of shielding it from creditors.  As a matter of sound

statutory construction and logic, the majority opinion fails.

17.    A few years later, the Supreme Court again faced the issue of whether to enforce

the Bankruptcy Code as written in the face of egregious debtor misbehavior or to contort the plain

language to do "equity" in that particular case. *Law v. Siegel*, 571 U.S. 415, 134 S.Ct. 1188 (2014).

Given a second bite at the apple, the Court chose to enforce the specific provisions of Section 522,

despite the debtor's misconduct, rather than to add a new layer of doubt and uncertainty to plain

statutory language:

> *Marrama* most certainly did not endorse, even in dictum, the view that equitable
> considerations permit a bankruptcy court to contravene express provisions of the
> Code.

*Siegel*, 571 U.S. at 426, 134 S.Ct. at 1197.  When read in context, *Siegel* does not overrule

*Marrama*, but it substantially limits its reach. *See In re Criscuolo*, 2014 Bankr. LEXIS 2138 *13

(Bankr. E.D.Va. 2014) (recognizing that *Siegel* narrows the breadth of *Marrama* while recognizing

that the court can still dismiss a Chapter 13 case for bad faith, if it is bad enough).

18.    One sympathizes with the majority in *Marrama*.  The debtor's conduct was

conniving and dishonest.  He transferred his principal asset for the purpose of shielding it from

creditors.  The debtor lied about its value in his schedules, valuing the house at zero, when the real

value was substantial.  After the transfer was discovered and the trustee notified the debtor that he

would seek to recover the house, the debtor sought to convert his case to Chapter 7 to dismiss the

trustee and put himself back in charge.  Under the circumstances, the Court's temptation to bend

the law to prevent such abuse is understandable.  Nonetheless, ignoring plain statutory language

to reach a desired result in a particular case is a dangerous practice.  It undermines the fundamental

purpose of statutory law, which is predictability.  The holding in *Siegel* implicitly recognizes that

danger and seeks to minimize it.

19.    When faced with binding case law that contradicts the plain language of a statute,

the Court should confine the precedent narrowly to the factual context in which arose and avoid

compounding the damage by extending it to different situations.  The debtor in *Marrama*

fraudulently transferred his principal asset seven (7) months before his petition date.  The debtor

lied about assets on his schedules, and then sought to convert his Chapter 7 case to Chapter 13 to

prevent the trustee from recovering that asset for the benefit of the estate.  The purpose of the

proposed conversion was to defeat the rights of creditors.  According to the majority in *Marrama,*

that conduct was sufficiently extreme to warrant denial of the debtor's motion to convert on the

basis of bad faith.  If those facts applied here, the holding in *Marrama* would bind the Court.

20.    Those facts do not apply.  The Debtors have not hidden their principal assets.  Their

principal asset is their homestead.  It is disclosed and valued accurately.  The Debtors' next most

valuable asset is a motor home.  It is disclosed.  The Debtors corrected certain inadvertent

omissions on the Schedules, but none of those corrections resulted in a single additional dollar

being available to creditors.  The "omitted" assets were equity interests in defunct entities with

zero value.  This was a "no asset" case, and it still is.  The Debtors did not make any fraudulent

transfers. The Debtors did not conceal any voidable transfers. The Debtors inadvertently omitted

certain pre-petition transfers of boats that were repossessed by secured creditors or sold in an arm's

length transaction. The correction of those errors improved the technical accuracy of Schedules

and SOFA, but it did not reveal any new assets that would be recoverable by the estate. None of

the errors or omissions were intentional and none were material.

21.    The U.S Trustee complains about the pre-petition "transfers" of two (2) trucks, a

2001 Jeep Cherokee Classic and a 2011 GMC Sierra. The Debtors never owned the Jeep Cherokee

Classic, which was worth at most $1,500. The Debtors previously had legal title to the 2011 GMC

Sierra, but Cord Johnson had relinquished possession of that truck to El Reno and El Reno had

picked up the payments more than year before the Petition Date. El Reno used the truck and the

Debtors did not. The Debtors believed that 2011 GMC Sierra was El Reno's truck and not theirs.[12]

The value of that truck is modest at best. The Debtors each have their own private vehicle, both

of which were disclosed on their Schedules. The Debtors were not hiding anything.

22.    The U.S. Trustee's biggest single complaint is an argument that Cord Johnson was

not candid and forthcoming about his role in El Reno. That is incorrect. He explained that his

own mother owns the company. He operates El Reno on a daily basis, but it is not his property.

He was not an officer on the Petition Date, but was given an official title shortly afterward. Rather

than accept this uncontroverted set of facts, the U.S Trustee launches into a semantic debate about

whether his management role in El Reno constitutes "control" that had to be disclosed on the

SOFA. The Debtors' did not interpret day to day management, even strategic decision making, as

"control" of the company, since the Debtors do not own any interest in El Reno, and Haven

---

[12] The transfer of 2011 GMC Sierra was disclosed on the Debtors' SOFA. The mechanics of the transfer from the Debtors to El Reno were not described correctly from a technical perspective, but the transfer itself was disclosed. The Debtors are not lawyers, and they were not hiding anything.

**DEBTORS' REPLY TO U.S. TRUSTEE'S OBJECTION TO THEIR MOTION TO CONVERT CHAPTER 7 CASE TO A CASE UNDER CHAPTER 11, AND FOR AUTHORITY TO ELECT TREATMENT UNDER SUBCHAPTER 5, AS A SMALL BUSINESS CASE - Page 14**
DM# 460568

Johnson could fire Cord Johnson at any time if she were unhappy with his performance. The U.S. Trustee argues that day to day management is "control." That is a semantic debate, about which reasonable minds may differ, but the Debtors' disagreement with the U.S. Trustee about the metaphysical essence of the word "control" is neither dishonesty nor bad faith.

23.   The U.S. Trustee argues that the Motion to Convert was filed in bad faith to escape the U.S. Trustee's Objection to discharge. The U.S. Trustee is correct about the Debtors' motivation but incorrect that those motivations constitute bad faith. The Debtors filed their Chapter 7 case hoping to get a discharge. Most debtors file for precisely that reason. If the Debtors could have gotten a discharge easily in Chapter 7 without the litigation risk and expense created by the Objection, they would have proceeded on that path. They would have no need to reorganize in Chapter 11. However, the Objection poses a risk that the Debtors will lose their discharge. The Debtors do not believe that they did anything dishonest, but all litigation entails risk and expense. The Motion to Convert and the commitment to seek reorganization in small business debtors under Subchapter 5 is a reasonable way to mitigate those risks.

24.   There is no "bad faith" in making that calculation. The Debtors are currently in Chapter 7, not Chapter 11. Chapter 7 debtors do not owe fiduciary duties to the bankruptcy estate. *Peterson v. Sanches (In re Mack Industries, Ltd)*, 606 B.R. 313, 319-29 (Bankr. N.D. Ill. 2019). The Debtors have specific statutory duties, but otherwise they are permitted to act in their economic self-interest as they perceive it. Indeed, other than trustees and estate professionals, the Court normally presumes that all parties in the bankruptcy arena act in their own economic self-interest. Altruistic motivations are neither presumed nor required. *In re Forum Health*, 444 B.R. 848, 862 n. 17 (Bankr. N.D. Ohio 2011) ("Based upon the Court's experience, the Court presumes each party acts in its own self-interest."). *See also HCA Self Services of Georgia, Inc. v. Employers*

*Health Insurance Co.*, 240 F.3d 982, 1007 n. 54 (11th Cir. 2001) ("We reiterate that our analysis presumes that all parties act out of economic self-interest.").[13]  Furthermore, nowhere does either Section 706 or 109 suggest that the Debtors' subjective motivations for conversion are relevant.

25.    Once the Debtors become small business debtors in possession, under Subchapter 5, they will become fiduciaries and assume obligations to the estate that they do not have in Chapter 7. If the Debtors make that commitment and follow through on it, it makes no difference whether they chose that path out of self-interest (which is presumed) or some altruistic motivation.  The Debtors choose the Chapter 11 small business path, because it serves their self-interest.  In doing so, they commit to pay their disposable income to their creditors for five (5) years.  They make no such commitment in Chapter 7.  In *Marrama*, the debtor sought conversion to Chapter 13 to keep the value of his principal asset away from his creditors. Here, the Debtors' Chapter 7 case is a no asset case.  However, the Debtors have future earning potential.  The only asset available to their creditors is the Debtors' future disposable income, which would be otherwise exempt from creditor claims under Texas Property Code Section 42.001(b)(1).  The Debtors propose to make that valuable asset available to their creditors through a small business Chapter 11 plan.  That is a tangible manifestation of good faith in action.  The Debtors' choice to make the next five (5) years of their otherwise exempt disposable income available to creditors under a small business reorganization plan is the polar opposite what the debtor was trying to do in *Marrama.*  The U.S. Trustee should be supporting them.

26.    In summary, the Debtors' right to convert to Chapter 11 is absolute so long as the Debtors are eligible for Chapter 11 relief.  11 U.S.C. §§ 706(a) and (d).  They are eligible for

---

[13] *HCA* is not a bankruptcy case but the Court's intuition is equally applicable here. Altruistic motivations are neither expected, nor required.  Parties who do not owe fiduciary duties are not held to the standards of fiduciaries.  The honest pursuit of economic self-interest is not bad faith.

Chapter 11.  *See* 11 U.S.C. § 109.  The holding in *Marrama* does not apply to this case on the

facts, which are the polar opposite.  Whether the Debtors can confirm a small business plan remains

to be seen, though there is no obvious reason why not.  The Court does not pre-judge that issue in

the context of a motion under Section 706(a).  The Motion to Convert should be granted.

**B.**     **The Debtors Are Not Quasi-Estopped to Seek Chapter 11 Relief**

27.     The U.S. Trustee makes the curious argument that the Debtors are "quasi-estopped"

to seek Chapter 11 relief, "because they have taken inconsistent positions regarding Cord

Johnson's role in El Reno and his gross income."  The argument fails for several reasons.

28.     First, the argument about "quasi-estoppel" contradicts the plain language of the

Bankruptcy Code.  Section 706(a) states that "a debtor may convert a case under this chapter to a

case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under

section 1112, 1208, or 1307 of this title."  Section 706(a) is limited only by Section 706(d), which

provides that the debtor must be eligible for relief under the Chapter to which conversion of the

Chapter 7 is sought.  *Marrama*, 549 U.S. at 373, 127 S.Ct at 1111.

29.     Eligibility for Chapter 11 relief is a federal statutory right and the requirements are

set forth in Section 109.  There are no requirements for eligibility outside the statute.  See *Toibb

v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197 (1991).  In that case, the debtor, Sheldon Toibb filed a

Chapter 7 case.  His schedules disclosed shares of stock in a company called Independent Electric

Corporation ("IEC"), but valued them at zero.  Mr. Toibb was an unemployed lawyer, not engaged

in any business.  The Chapter 7 Trustee, Stuart Radloff, found a willing buyer for the IEC stock

and notified creditors that he intended to sell it for $25,000.  Mr. Toibb filed a motion to convert

his Chapter 7 case to Chapter 11, presumably to administer the stock himself.  Mr. Radloff argued

that Mr. Toibb was not eligible for Chapter 11 relief because he was not engaged in any business.

The Supreme Court held that eligibility for Chapter 11 relief is statutory and that the Court should

look no further than the statute itself.

> In our view, the plain language of the Bankruptcy Code disposes of the question
> before us. Section 109, 11 U. S. C. § 109, defines who may be a debtor under the
> various chapters of the Code. Section 109(d) provides: "Only a person that may be
> a debtor under chapter 7 of this title, except a stockbroker or a commodity broker,
> and a railroad may be a debtor under chapter 11 of this title." Section
> 109(b) states: "A person may be a debtor under chapter 7 of this title only if such
> person is not -- (1) a railroad; (2) a domestic insurance company, bank, . . .; or (3)
> a foreign insurance company, bank, . . . engaged in such business in the United
> States." The Code defines "person" as used in Title 11 to "include [an]
> individual." § 101(35). Under the express terms of the Code, therefore, petitioner
> is "a person who may be a debtor under chapter 7" and satisfies he statutory
> requirements for a Chapter 11 debtor.
>
> The Code contains no ongoing business requirement for reorganization under
> Chapter 11, and we are loath to infer the exclusion of certain classes of debtors
> from the protections of Chapter 11, because Congress took care in § 109 to specify
> who qualifies -- and who does not qualify -- as a debtor under the various chapters
> of the Code. Section 109(b) expressly excludes from the coverage of Chapter 7
> railroads and various financial and insurance institutions. Only municipalities are
> eligible for the protection of Chapter 9. §109(c). Most significantly, §
> 109(d) makes stockbrokers and commodities brokers ineligible for Chapter 11
> relief, but otherwise leaves that Chapter available to any other entity eligible for the
> protection of Chapter 7. Congress knew how to restrict recourse to the avenues of
> bankruptcy relief; it did not place Chapter 11 reorganization beyond the reach of a
> nonbusiness individual debtor.

*Toibb*, 501 U.S. at 160-61, 111 S.Ct. at 2199.  Here, the Debtors are eligible for Chapter 11 relief

under the plain language of the statute.  When a federal statutory right is at issue, the Court looks

first to the statutory language.  When the statutory language is clear, the Court looks no further:

> First, this Court has repeated with some frequency: "Where, as here, the resolution
> of a question of federal law turns on a statute and the intention of Congress, we
> look first to the statutory language and then to the legislative history if the statutory
> language is unclear." *Blum v. Stenson,* 465 U.S. 886, 896, 79 L. Ed. 2d 891, 104 S.
> Ct. 1541 (1984). The language of *§ 109* is not unclear.

*Toibb, 501 U.S. at 162, 111 S.Ct. at 2200.  See also Ron Pair*, 489 U.S. at 241, 109 S.Ct. 1026,

1030 (1989) (when statutory language is clear, the Courts enforces the statute according to the

plain meaning of the words).   The U.S. Trustee asks the Court to disregard the plain meaning of

Sections 706 and 109 and create a new unwritten exception to eligibility for debtors who are

"quasi-estopped" from Chapter 11 relief by statements made in their schedules or in a Section

2004 examination.   There is no legal basis for doing so, and the practice of ignoring clear statutory

language to achieve more equitable results in a particular case undermines the precise purpose of

statutory law, which is predictability.   The Supreme Court instructs the bankruptcy courts to

restrain that urge: "*Marrama* most certainly did not endorse, even in dictum, the view that

equitable considerations permit a bankruptcy court to contravene express provisions of the Code.

*Siegel*, 571 U.S. at 426, 134 S.Ct. at 1197.   "Quasi-estoppel" is a Texas equitable doctrine alien to

the Bankruptcy Code.[14]   If Congress had intended to incorporate that concept into Sections 706 or

109, Congress would have done so.[15]   It did not.

      30.   The U.S. Trustee's argument would also fail as a matter of Texas law.   Quasi-

estoppel is a somewhat amorphous doctrine, but it relies on the equitable principle that a person

who has accepted the benefits of a transaction cannot then deny the transaction if others would be

harmed.   *Long v. Turner*, 134 F.3d 312, 318-19 (5th Cir. 1998) (citing *Atkinson Gas Co. v.

Albrecht,* 878 S.W.2d 236, 240 (Tex.App.—Corpus Christi 1994, writ denied) ("... quasi-estoppel

forbids a party from accepting the benefits of a transaction or statute and then subsequently taking

an inconsistent position to avoid corresponding obligations or effects"); *Mexico's Industries, Inc.

v. Banco Mexico Somex,* 858 S.W.2d 577, 581 n. 7 (Tex.App.—El Paso 1993, writ

denied) (same); *Matter of Davidson,* 947 F.2d 1294, 1297 (5th Cir. 1991) (same); *Turcotte v.

Trevino,* 499 S.W.2d 705, 712 (Tex.Civ.App.—Corpus Christi 1973, n.r.e.) (by virtue of estoppel

---

[14] In his Objection, the U.S. Trustee cites two (2) Fifth Circuit cases, but a review of those cases show that the underlying law is Texas case law, not federal law.

[15] Notably, in *Toibb*, the debtor scheduled the IEC stock at zero value.   No one contended that he was "estopped" to convert his case to Chapter 11 because that representation was erroneous and the stock was worth $25,000.

"[w]here one having the right to accept or reject a transaction takes and retains benefits thereunder, he ordinarily ... cannot avoid its obligation or effect by taking a position inconsistent with it at a later time"). None of the predicated facts needed for quasi-estoppel are present here. That U.S. Trustee has not identified any "transaction" between the Debtors and anybody else upon which the estoppel would be based. The U.S Trustee has not identified any obligations that the Debtors are trying avoid, or any person who would be harmed by the conversion of the Debtors' Chapter 7 case to Chapter 11, or how that person would be harmed. The Debtors have not accepted the benefit of any statute, except that they filed a Chapter 7 petition, which is a statutory right. Filing such a petition does not prevent them from seeking conversion of their case to Chapter 7. *See* 11 U.S.C. § 706(a). The Debtors are not seeking to avoid any obligation. The Debtors have derived no benefits from their Chapter 7 filing other than the automatic stay, which is a statutory benefit common to all filers. In seeking to convert their case under Section 706(a), the Debtors are not acting in any way inconsistent with being debtors in bankruptcy.

31.    Finally, the U.S Trustee's factual complaint about inconsistent statements mischaracterizes the facts. The reason for the alleged "inconsistencies" is that factual circumstances have changed over time. Cord Johnson's statements about his position at El Reno and his salary were true when made. His statements on those subjects changed over time as circumstances changed. On the Petition Date, Cord Johnson was not a company officer. Thus, the SOFA did not state that he was. Cord Johnson was later given the title of President. At the Section 341(a) meeting, more than two (2) months after the Petition Date, he testified that he was an officer, because he was a company officer at that time. Both statements were true when made. In 2018, Cord Johnson's salary from El Reno was approximately $2,500 per month. In October 2019, he testified that he had never earned more than $4,000 per month from El Reno. That

statement was truthful when made.  By May 2020, Cord Johnson's salary had been increased to

$6,000.  The Motion to Convert so states, and that statement was true in May 2020.  In January

2020, El Reno's trucks were mostly idle, and it was not profitable.  However, it is a seasonable

business.  By May 2020, it was making money.  El Reno still owes approximately $100,000 to the

IRS, but it is now paying new Section 941 taxes as they accrue.  None of this is hard to understand.

It is as though the U.S. Trustee asked Mr. Johnson how old he was in three (3) separate years, got

three (3) different answers, and now complains that the answers are inconsistent.  Each statement

was the truth at the time.  In this context, the Debtors have done nothing wrong.  The equitable

doctrine of quasi-estoppel has no application.

**C.      The Debtors Are Eligible for Subchapter 5 Relief**

32.      The U.S. Trustee's last argument is that the Debtors are not eligible for relief under

Subchapter 5 because the Debtors do not own or control El Reno, a fact that the Debtors admit and

the U.S. Trustee seems to challenge (without any evidence).  The argument fails because here, as

elsewhere in the Objection, the U.S. Trustee reads words into the statute the Congress chose to

leave out.  In doing so, the U.S. Trustee's preferred construction violates the plain meaning of the

rule that the Courts construe the statute as written and does not read into the statute other words

that Congress chose to leave out. The statute defines the term "small business debtor" in relevant

part to mean:

> a person engaged in commercial or business activities (including any affiliate of
> such person that is also a debtor under this title …) that has aggregate non-
> contingent, liquidated secured and unsecured debts as of the date of the filing of the
> petition … in an amount not more than $7,500,000 … not less than 50% of which
> arose from the commercial or business activities of the debtor.

11 U.S.C. § 1182(1)(A).  The Debtors meet that definition.  Their obligations are predominantly

business debts incurred by Cord Johnson in the oil and gas business.  He operated several now

defunct oil and gas related entities, including Crooked Oak Oil, Ltd., Jacie Oil Co., JCS Oil and

Gas, LLC, and RICDF, LLC.  Mr. Johnson guaranteed a number of company obligations, several

of which have been reduced to personal judgments against him.  The largest single obligation is

the claim asserted by Armadillo Exploration and John Hill.  The Debtors have scheduled a claim

in the amount of $500,000.  The claim is hotly disputed, though clearly large.  In a Chapter 11, the

Debtors would seek an agreement with Armadillo and Mr. Hill on the proper amount of the claim

for plan purposes.  The Texas Railroad Commission also asserts Mr. Johnson's personal liability

as operator for the expenses of plugging and abandoning certain non-producing wells.  Those debts

are liquidated by administrative order, though Mr. Johnson disputes personal liability.  The

Debtors' personal or consumer debts are significant, but manageable.  Their business-related debts

caused the bankruptcy filing and comprise more than 50% of the total as of the Petition Date.

33.    The Debtors propose to use the provisions of Chapter 11, Subchapter 5 to

reorganize and satisfy the residual business debts that arose from Cord Johnson's pre-petition oil

and gas businesses before he started working for El Reno.  As the U.S. Trustee notes in the

Objection, at least one Bankruptcy Court has recognized that purpose as a permissible use of

Subchapter 5, regardless of whether the Debtor is still engaged in any "business or commercial

activities."  *See In re Wright*, No. 20-01035 (ECF Entry 37) (Banks. S.C. April 27, 2020):

> The SBRA and Subchapter V were designed to broaden relief available to address
> small business debt.  Although the brief legislative history of the SBRA indicates
> that it was intended to improve the ability of small business to reorganize and
> ultimately remain in business, nothing therein, or in the language of the definition
> of small business debtor, limits application to debtors **currently** engaged in
> business or commercial activities.

*Wright*, at 5 therein (citing 2 Collier on Bankruptcy ¶ 101.51D (16th Ed. 2020).  (Emphasis in the

original).  The U.S. Trustee in this case, and in *Wright*, have asked the Court to insert the words

"currently" or "at the petition date" into the text of statute before the words "engaged in

commercial or business activities." However, the words "currently" or "as of the date of the filing

of the petition," and the temporal limitation that those words import, do not appear at that point in

the statutory text and do not modify the words "engaged in commercial or business activities."

Obviously, Congress knew how to indicate a temporal limitation as it plainly said that the debtor

may not owe more than $7,500,000 in non-contingent, liquidated secured and unsecured debts "as

of the date of the filing of the petition." The fact that the words "as of the date of the filing of the

petition" are used to modify or condition when the debtor's obligations may not exceed $7,500,000

but are not used to modify or condition the words "engaged in commercial or business activities"

is the best evidence that Congress did not intend that temporal limitation. The Court should decline

the U.S. Trustee's invitation to amend the statute by adding invisible words to the text.

34.     The U.S Trustee cites *Hileman v. Pittsburgh & Lake Erie Properties, Inc.*,  290

F.3d 516 (3rd Cir. 2002) to argue that "engaged in" must be read to mean "engaged in *as of the

date of the filing of the petition*," despite the lack of such language in Section 11 U.S.C. §

1182(1)(A). The first flaw with that argument is textual. The statutory contexts are different.

Section 101(44) defines the term "railroad" as "a common carrier by railroad in the transportation

of individuals or property or owner of trackage facilities leased by such common carrier." The

words "as of the date of the filing of the petition" do not appear anywhere in that text. Conversely,

in Section 1182(1)(A), the words "as of the date of the filing of the petition" appear in the text to

modify when the debtor may not owe more than $7,500,000, but they do not appear in text to

modify the words "engaged in business or commercial activities." Absent some clear contrary

indication in the statute, the Court presumes that was intentional. That statute means what it says.

35.     Second, the factual contexts are different. The statutory definition of "railroad"

includes the requirements of running trains and being a common carrier. In *Hileman*, neither had

been true for several years.  The debtor had stopped running trains, sold off its tracks, and given

up common carrier status several years before its bankruptcy filing.  At the petition date, the debtor

was a real estate company, not a railroad.  The debtor did not file a railroad bankruptcy case and

denied that it was a railroad.  Two (2) personal injury claimants filed claims and argued that the

debtor had to be treated as railroad involuntarily because their injuries arose years earlier while it

still ran trains.  The Third Circuit noted that the complex statutory scheme for railroad bankruptcy

was intended to protect the public interest in the provision of railroad transportation, and there was

no reason to invoke that scheme for a debtor that ran no trains and was not a common carrier.

*Hileman*, 290 F.3d at 520.  That made sense in context, but it has no application to this case.

36.     The U.S. Trustee preferred construction of the Section 1182(1)(A) suffers from the

same basic flaw in a slightly different context.  The Objection argues that Cord Johnson is not

engaged in business or commercial activities because he does not own El Reno or control it.  That

argument again asks the Court to add invisible words to the statutory text.  El Reno is an active

company, engaged in the trucking business and (again) in the oil business.  It is a commercial or

business activity.  Cord Johnson manages the business on a day to day basis and has since his

father died in November 2018.  Even though Mr. Johnson does not own El Reno, and it is subject

to the control of the 100% owner, the operation of El Reno's business is a full-time business

activity that occupies Mr. Johnson's time and attention.  He is fully engaged in carrying out that

business and commercial activity, for which he is compensated.

37.     When construing a statute, the Court begins with the text of the statute and, absent

a different definition, "interprets the statutory terms in accordance with their ordinary meaning."

*Wright, citing Moody v. Huntington Ingalls Inc.,* 879 F.3d 96, 98 (4th Cir. 2018).  If the statutory

language is unambiguous, the Court need not look further.  *Ron Pair*, 489 U.S. at 241; 109 S.Ct.

at 1030. The relevant words are "engaged in business or commercial activities." The statute does not define the word "engaged." Nor is it a recognized term of art. Therefore, the Court looks to the ordinary meaning of that word. Merriam-Webster offers several definitions of "engage." Those definitions include: "to deal with, especially at length," "to do or take part in something," "to begin and carry on an enterprise of activity," and "to give attention to."[16] By any of those ordinary dictionary definitions, Cord Johnson is "engaged" in a business or commercial activity managing El Reno, even though he does not own it, and it is subject to his mother's control. The statute does not say that the debtor must own the business or control it. It is enough that the debtor is substantially "engaged" in that activity. The Court should decline the U.S. Trustee's invitation to add invisible words into the statute, or to find hidden meanings or limiting conditions absent from the statutory text. If Congress had intended such limiting conditions, it would have included them in the statutory text. The Objection fails.

## IV.

## **REQUESTED RELIEF**

WHEREFORE, PREMISES CONSIDERED, the Debtors request that the Court overrule all objections and enter an Order Granting the Motion as filed.

June 9, 2020.

Respectfully submitted,

/s/ *Robert A. Simon*
Robert A. Simon
Texas State Bar No. 18390000
WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0570
Facsimile: (817) 878-0501
**Attorneys for Cord Davis Johnson**
**and Sunny Lea Johnson, Debtors**

---

[16] https://merriam-webster.com/dictionary/engage

## CERTIFICATE OF SERVICE

I hereby certify on this the 9th day of June, 2020, that I caused to be served a true and correct copy of the of the foregoing Reply upon all parties registered to receive service via this Court's ECF notification system and the attached service list by First Class United States Mail, in a properly addressed envelope, postage pre-paid.

/s/ ***Robert A. Simon***
Robert A. Simon